**In re J & S CONVEYORS, INC., Debtor.**

**No. 95–22563.**

United States Bankruptcy Court, W.D. New York.

Aug. 11, 2009.

Marjorie A. Bialy, Jaeckle Fleischmann & Mugel LLP, Buffalo, NY, for Debtor.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On October 27, 1995, J & S Conveyors, Inc. (the "Debtor") filed a petition initiating a Chapter 11 case.

On October 31, 1995, the National Bank of Geneva ("NBG") filed a motion to ap-

prove a stipulation (the "Cash Collateral Stipulation") between the Debtor and NBG for the use of cash collateral, adequate protection and other relief. When there was no opposition interposed, the motion was granted on the November 15, 1995 return date, and an order approving the Stipulation was entered on November 21, 1995.

On November 13, 1995, the Debtor filed its Statements and Schedules, including a Schedule B of Personal Property ("Schedule B") and a Schedule G of Executory Contracts and Unexpired Leases (the "Executory Contracts Schedule").

On November 27, 1996, the Office of the United States Trustee (the "UST") filed a motion which requested that the Court convert or dismiss the Debtor's Chapter 11 case, which was granted on December 19, 1996 and an order was entered converting the case to a Chapter 7 case on December 20, 1996.

On December 30, 1996, Kenneth W. Gordon, Esq. was appointed as the trustee in the converted Chapter 7 case (the "Trustee").

On December 30, 1996, a Bankruptcy Court Clerk's Notice to Creditors of the Section 341 Meeting of Creditors was mailed to creditors and parties-in-interest (the "Chapter 7 Notice to Creditors").

On February 7, 1997, the Trustee filed a Report of No Assets and on November 20, 1998, the Chapter 7 case was closed.

On September 12, 2006, the Trustee filed a Motion to Reopen the Chapter 7 Case, and an order was entered reopening the case (the "Order to Reopen") on September 13, 2006.

On September 23, 2006, the Trustee filed a Notice of Assets and a Request for Notice to Creditors.

On October 15, 2006, a Bankruptcy Court Clerk's Notice of Need to File Proofs of Claim Due to Discovery of Assets (the "Asset Notice") was mailed. The Notice required creditors to file proofs of claim in the reopened Chapter 7 case by January 16, 2007 (the "Initial Bar Date").

The case docket indicates that there were eleven (11) claims (the "Reopened Chapter 7 Claims") filed by creditors in the reopened Chapter 7 case before the Initial Bar Date passed.

On April 24, 2008, the Trustee filed a Final Report and Notice of Proposed Distribution to Creditors and Bar Date Notice (the "Final Report"), which indicated that: (1) there was $355,001.26 available for the payment of administrative expenses and for distribution to creditors; (2) there was a total of $69,183.86 in reopened Chapter 7 and prior Chapter 11 case administrative expenses to be paid, including $21,014.72 in commissions due to the Trustee; (3) Jan Exman ("Exman"), who had purchased the interests of the equity holders in the Debtor, had filed two of the Reopened Chapter 7 Claims: (a) $351,017.12 ("Claim No. 7"); and (b) $914.03 ("Claim No. 8");[1] (4) Ex-

---

1. Exman filed Claim No. 7 on December 21, 2006 for $351,017.12, indicating that the basis of the Claim was a "death benefit" incurred on March 11, 1998, specifically a "death benefit reported by William Penn Life Insurance Co. of N.Y...." Exman also filed Claim No. 8 on December 18, 2006 for $914.03 for an "advance payment for utility service not finished...." In each claim, Exman referred to the attached letter from the New York State Office of the State Comptroller, dated May 8, 2006 to Jean Jorgensen.

The Comptroller's Office advised Jorgensen that they were holding funds, including advanced payments by J & S Conveyors for utility services not completed for $914.03, and a death benefit reported by William Penn Life Insurance Co. of New York for $351,017.12, with J & S Conveyors listed as the owner and sole beneficiary. Exman filed an amended Claim No. 7 on November 12, 2008 claiming the $351,017.12 based upon

man had subordinated his claims to the other Reopened Chapter 7 Claims; and (5) Exman's subordinated Claims No. 7 and 8 would receive a total distribution of $271,026.32.

A hearing on the Final Report was scheduled for May 21, 2008. However, pursuant to the Court's procedures, a hearing was not conducted when no opposition was interposed.

On May 13, 2008, the Trustee filed a Statement of Intent to Abandon any right that the estate might have to recover any interest that might be due on unclaimed life insurance proceeds from William Penn Life Insurance Company of New York (the "William Penn Policy") on the grounds that: (1) the abandonment had been requested by Exman who purportedly owned all of the Debtor's stock; and (2) based upon the analysis set forth in the Final Report, the Trustee anticipated that other than to Exman there would be a 100% distribution to the creditors with Reopened Chapter 7 Claims.

On May 29, 2008, before the Court entered an order approving the Final Report, Ronald Hawkins, d/b/a Hawki Tools ("Hawkins"), filed late opposition to the Final Report, which asserted that: (1) Hawkins and numerous other creditors had filed proofs of claim in the Debtor's prior Chapter 11 case that had not been objected to by the Debtor or any other party in interest in the Chapter 11 case, or

by the Trustee prior to the filing of his Final Report (the "Chapter 11 Claims"); [2] (2) having not been objected to, those Claims were deemed allowed; (3) the Claims had not been included as allowed claims or scheduled to receive a distribution in the Final Report; (4) the attorneys for Hawkins had reviewed the electronic records of the Debtor's reopened Chapter 7 case and determined that, for some reason, the records did not include the Chapter 11 Claims; and (5) the Court should not enter an order approving the Final Report until Hawkins and others similarly situated were provided with an opportunity to have their opposition to the Final Report considered by the Court.

Along with his opposition to the Final Report, Hawkins also filed a Motion to Enlarge the Time to Respond to the Trustee's Final Report (the "Motion to Enlarge"). As the result of correspondence among Hawkins, the Trustee and Exman, and a hearing conducted on June 18, 2008 on the Motion to Enlarge, the Motion and the Final Report were both withdrawn.

In a letter to the Trustee, dated June 4, 2008, Exman withdrew his offer to subordinate his Claim No. 7 and Claim No. 8 to the other Reopened Chapter 7 Claims.[3]

On June 20, 2008, the Trustee filed motions objecting to the Chapter 11 Claims filed by Betty J. Savage, Dale R. Nye, Michael J. Kostecke and David E. Hamilton. The Trustee objected to these claims

---

"subrogation & contract," and the basis for perfection as the assignment of life insurance.

**2.** One proof of claim, by the United Parcel Service for $124.93 on August 7, 1997, was filed in the converted Chapter 7 case. The Court considered this claim along with the Chapter 11 Claims since, as discussed herein, due to the facts of this case, the Trustee's objection and the Court's ruling upon the validity of the claim applied equally to the United Parcel Service claim.

**3.** The Trustee's Statement of Intent to Abandon was scheduled for a hearing on June 11, 2008 in the event that opposition was filed. However, no opposition was received. Since the Statement of Intent to Abandon was specifically premised upon the Final Report, including a 100% distribution to the creditors who had filed the Reopened Chapter 7 Claims because of Exman's subrogation of his claims to these Claims, the request to abandon was not granted in view of the issues raised by Hawkins and the withdrawal by Exman of his offer to subrogate.

on various grounds, and on July 24, 2008, after the claimants had failed to interpose any opposition or appear at a scheduled July 23, 2008 hearing, the Court entered orders disallowing those claims.

From September 9 through September 11, 2008, the Trustee filed motions objecting to the Chapter 11 Claims (collectively, the "Chapter 11 Claim Objections"), on the grounds that: (1) the claims were now over ten years old; (2) on August 1 or August 4, 2008, the Trustee had sent a letter to each of the claimants requesting verification that their claim was still valid, with a response deadline of August 15, 2008; (3) no response had been received from any of the claimants; and (4) the claims were now barred by the six-year New York State statute of limitations on contractual claims, and, therefore, must be disallowed because the Chapter 7 case had been closed for over seven years with no discharge injunction or other stay in effect that would have tolled the statute of limitations. A number of these Chapter 11 claimants filed opposition to the Chapter 11 Claim Objections.

In supporting pleadings and at oral argument on the Chapter 11 Claim Objections, the Trustee and Exman, who supported the Objections, argued that, although the claimants may have had valid claims against the Debtor at the time they filed their proofs of claim in the Chapter 11 case, the Chapter 11 Claims were no longer valid because: (1) in a routine consumer Chapter 7 case where the debtor receives a discharge: (a) there is an automatic stay in effect during the course of the case, which stays a creditor from taking any action to avoid the expiration of any applicable state law statute of limitations; and (b) the debtor's discharge and the discharge injunction provided for in Section 524(a)(2)[4] then go into effect when a Chapter 7 case is closed to prevent any similar actions by a creditor once the Chapter 7 case is closed; (2) unlike that consumer Chapter 7 case, in the instant case, there is no discharge available or granted to a Chapter 7 debtor corporation that stays or tolls any applicable state law statute of limitations once the case is closed; (3) Section 108(c)[5] specifically provides a thirty-day time frame for creditors to protect their rights and remedies when a Chapter 7 corporate debtor case is closed so that they can prevent their claims from becoming time-barred under any applicable state law statute of limitations; and (4) none of the claimants now had a valid and le-

4. Section 524(a)(2) provides that:

    (a) A discharge in a case under this title—
    (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]
    11 U.S.C. § 524 (2009).

5. Section 108(c) provides that:

    (c) Except as provided in section 524 of this title, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, or against an individual with respect to which such individual is protected under section 1201 or 1301 of this title, and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
    (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
    (2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201, or 1301 of this title, as the case may be, with respect to such claim.
    11 U.S.C. § 108 (2009).

gally enforceable claim against the Debtor, because the state law statute of limitations had expired after the Chapter 7 case was closed and none of the claimants had taken the necessary steps to prevent their claims from becoming time-barred.

The Chapter 11 claimants argued that they each had a valid right to payment under Section 101(5)(a) [6] at the time they filed their proofs of claim in the Chapter 11 case, so there was no valid basis to disallow the claim under Section 502(b)(1) [7] at the time their proof of claim was filed, and the fact that their claim might now be unenforceable because of the running of any state law statute of limitations was irrelevant under Sections 101 and 502 in the reopened Chapter 7 case.

The Court agreed with the Chapter 11 claimants and orally ruled [8] that the Chapter 11 Claims that had not been specifically disallowed by the Court in the reopened Chapter 7 case, were valid and allowed. The Court reasoned that the Chapter 11 Claims were valid and enforceable against the Debtor at the time they were filed in the Chapter 11 case, so these creditors had established the required right to payment under Sections 101(5)(a) and 502(b)(1) for purposes of the administration of the estate and any prepetition assets that might be administered at any time, including in a case converted to Chapter 7 and even a converted case that was closed and reopened. This ruling was without prejudice to the Trustee bringing further objections to disallowance on grounds other than the basis that any right to payment was now unenforceable because of the expiration of any applicable state law statute of limitations after the case was closed.

On September 9 through September 11, 2008, the Trustee also filed motions (the "Chapter 7 Claim Objections"), objecting to the Reopened Chapter 7 Claims.[9]

The grounds for the Trustee's Chapter 7 Claim Objections were, once again, that at the time the claims were filed the creditors no longer had a valid and enforceable right to payment from the Debtor, because the applicable six-year statute of limitations on contract claims under New York State Law ran between the time that the Chapter 7 case was closed and the time that it was reopened.

---

**6.** Section 101(5)(a) provides that:

    (5) The term "claim" means—
    (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]

  11  U.S.C. § 101 (2009).

**7.** Section 502(b)(1) provides that:

    (b) Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
    (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]

  11  U.S.C. § 502 (2009).

**8.** The Court and the parties agreed that the ruling was interlocutory and would be included with substantially greater detail in a later written Decision & Order to be filed in the case.

**9.** The Trustee did not object to Exman's claims at this time, but subsequently objected in the Trustee's Response to Exman's Cross–Motion to Turnover Abandoned Property and to Vacate Order Reopening Case and Objection to Exman's Claim as Subrogated Creditor, filed November 28, 2008, following the Court's oral ruling that the Reopened Chapter 7 Claims were not valid, and Exman's Amendment of Claim No. 7 on November 12, 2008 based upon subrogation and contract.

Ralph W. Earl Company, Inc. ("RWE"), one of the creditors that filed a Reopened Chapter 7 Claim, interposed opposition to the Trustee's Chapter 7 Claim Objections, which asserted that: (1) RWE was a scheduled creditor in the original Chapter 11 case; (2) RWE did not file a claim in the converted Chapter 7 case prior to the time that the case was closed because it received the Chapter 7 Notice to Creditors, which in two separate places in large blocked type stated, **"DO NOT FILE A PROOF OF CLAIM UNTIL YOU RECEIVE NOTICE TO DO SO";**[10] (3) RWE timely filed a proof of claim in the reopened Chapter 7 case in response to the Asset Notice; and (4) its proof of claim should be allowed because "[i]t would be an absurd outcome that a creditor who acted in accordance with instructions of the Court could now be time barred."

The Court agreed with the arguments of the Trustee in his Chapter 7 Claim Objections, and orally ruled [11] that those claims could not be allowed under Section 502(b)(1), notwithstanding the Chapter 7 Notice to Creditors, because: (1) the Court believed that at the time a creditor files a proof of claim in a bankruptcy case, the creditor must have a valid and enforceable right to payment, as required by Sections 101(5)(a) and 502(b)(1); (2) although the claimants may have had a valid and enforceable right to payment on the date the Debtor filed its petition, and while the applicable state law statute of limitations was stayed by the automatic stay, and, therefore, tolled during the course of the Chapter 11 case and the converted Chapter 7 case before it was closed, there was nothing that prevented those claimants from taking the necessary actions after the closing of the Chapter 7 case, including during the period permitted by Section 108(c), to insure that their enforceable right to payment did not become time-barred should the Chapter 7 case ever be reopened; (3) creditors are presumed to know the law requiring them to have a valid and enforceable right to payment at the time they file a proof of claim in a bankruptcy case; (4) the Chapter 7 Notice to Creditors could not alter the explicit requirements of Sections 101(5)(a) and 502(b)(1), because it was generated pursuant to Rule 2002(e),[12] which by virtue of its

**10.** The Chapter 7 Notice to Creditors, dated December 31, 1996, is entitled "Notice of Commencement of Case Under Chapter 7 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates" and was issued by Martin H. Oogjen III, Clerk of the Bankruptcy Court. In all caps and bold at the beginning of the body of the notice, it states: "AT THIS TIME THERE APPEARS TO BE NO ASSETS AVAILABLE FROM WHICH PAYMENT MAY BE MADE TO UNSECURED CREDITORS. DO NOT FILE A PROOF OF CLAIM UNTIL YOU RECEIVE NOTICE TO DO SO." At the end of the body of the notice, the latter sentence is repeated in all caps and bold. The docket reflects that the certificate of mailing for this notice was filed on January 2, 1997. The Court notes that an amended notice was sent on January 8, 1997, which was identical to the notice dated December 31, 1996 except it was amended to correct the date of conversion. The Court further notes that its copies of these notices, as well as any other documents in the Court's possession, which were filed in this matter from November 20, 1998 through October 27, 2005, were provided by the parties since the Court's Case Management/Electronic Case Files (CM/ECF) System does not contain electronic copies for those dates, nor does the Court maintain a paper file, or have a requirement that the paper file must be retrieved from storage.

**11.** The Court and the parties agreed that the ruling was interlocutory and would be included with substantially greater detail in a later written Decision & Order to be filed in the case.

**12.** Bankruptcy Rule 2002(e) provides that:

(e) Notice of No Dividend. In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient

status as a procedural rule, cannot abridge the substantive rights of parties, including other creditors who have complied with the requirements of Sections 101(5)(a) and 502(b)(1) when they filed a proof of claim, and expect other creditors who are to share in any distribution to have also complied with the requirements of those Sections; and (5) the language of the Chapter 7 Notice to Creditors, which specifically instructed creditors not to file a claim, did not comply with Rule 2002(e) itself, which provides that the notice may include a statement that it is unnecessary to file claims, although for creditors receiving such a notice, the Court acknowledges that may be a distinction without a difference.

On November 12, 2008, Exman filed an amended claim 7, which alleged that he was owed the $351,017.12 in life insurance proceeds based upon "subrogation & contract" and that the basis for perfection was the assignment of life insurance.

On November 21, 2008, Exman filed a Notice of Motion to Turnover Abandoned Property and to Vacate the Order Reopening the Case (the "Turnover Motion"), which asserted that: (1) the Debtor's Keyman life insurance policies with William Penn Life Insurance Company of New York and National Benefit Life Insurance Company (collectively, the "Insurance Poli-cies"), which had been assigned to several creditors as collateral for loans made to the Debtor, were properly scheduled on the Executory Contracts Schedule, filed on November 13, 1995, for purposes of 554(c),[13] and, thus they were abandoned to the Debtor upon the closing of the Debtor's Chapter 7 case; (2) since the Insurance Policies and any resulting proceeds were abandoned, they are no longer property of estate, leaving no assets for the Trustee to administer or distribute, thus the Order to Reopen should be vacated; and (3) as set forth in the pleadings in support of the Trustee's various claim objections, the Chapter 11 and Reopened Chapter 7 Claims were barred by the applicable state law statute of limitations. Exman further asserted that he was entitled to the proceeds of the Insurance Policies as a subrogated secured creditor[14] because: (1) after the liquidation of all of Debtor's assets by the secured creditors during and subsequent to the closing of the Chapter 7 case, except for the Insurance Policies, Debtor owed approximately $575,000.00 to its secured creditors, NBG and Ontario County ("Ontario"); (2) on May 9, 1997 Debtor's sole shareholder Morell Jorgensen ("Morell") and his wife Jean Jorgensen ("Jorgensen"), who were guarantors of the loans due to NBG, paid ap-

assets become available for the payment of a dividend, further notice will be given for the filing of claims.

**13.** Schedule G is entitled "Executory Contracts and Unexpired Leases." Debtor's Schedule G, filed on November 13, 1995 lists several leases and insurance policies, including the William Penn Policy and National Benefit Policy. In the section providing: "Description of Contract or Lease and Nature of Debtor's Interest ...", Debtor describes both Insurance Policies as "Officer's Life Insurance, Policy owned by J & S Conveyors, Inc., $150,000 assigned to Ontario County" and indicates for the William Penn Policy, "$150,000 assigned to Ontario County" and for the National Benefit Policy, "$500,000 assigned to National Bank of Geneva."

Section 554(c) provides that:
(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.
11 U.S.C. § 554 (2009).

**14.** Specifically, Exman claims the total insurance proceeds by virtue of his $275,000.00 subrogation claim, plus the 9% New York State statutory interest rate, aggregating to $534,625.00 from May 9, 1997, plus attorney's fees and costs.

proximately $275,000.00 to NBG from the sale of their home; (3) Morell passed away on March 11, 1998, over one year after the Chapter 7 case was substantively, but not procedurally closed,[15] when there was no reason for his family to believe that the bankruptcy case was still open;[16] (4) NBG and Ontario each received $150,000.00 from the Insurance Policies in satisfaction of their then remaining claims against the Debtor; and (5) after the reopening of Debtor's Chapter 7 case on September 13, 2006, Jorgensen, who became the sole beneficiary of Morell's estate, and therefore the Debtor's sole shareholder, transferred all of the Debtor's stock and the Debtor's rights in and to the Insurance Policies, including subrogation rights, to Exman by a December 1, 2006 Bill of Sale (the "Bill of Sale").[17]

On November 28, 2008 and December 1, 2008, the Trustee filed a Response to the Turnover Motion and Objection to Exman's Claim as Subrogated Creditor, which asserted that the Insurance Policies and any proceeds were not abandoned because: (1) they were improperly scheduled as executory contracts on Schedule G, rather than where they were required to be scheduled, as personal property on Schedule B, so that they were not abandoned under Section 554(c), which requires

that property be properly scheduled pursuant to Section 521(1);[18] (2) even if an asset is brought to the Trustee's attention, it must be properly scheduled in order for it to be abandoned under Section 554(c); and (3) the equities favored the Trustee and the Debtor's unsecured creditors because: (a) no one advised the Trustee of Morell's death; (b) Exman's purported interest in the proceeds of the Insurance Policies was acquired after the Chapter 7 case was reopened; and (c) Exman and J & S Conveyors, Inc., each received notice of the Trustee's adversary proceeding commenced on February 20, 2007 to recover the Insurance Policy proceeds for the estate, but neither intervened claiming a superior right to the proceeds, which constituted a waiver. The Trustee further argued that: (1) the Chapter 7 case was properly reopened, pursuant to Section 350(b),[19] in order to administer assets; any deemed abandonment was due to an inadvertent error by the Trustee; and any interest obtained by Exman was after the case was reopened; and (2) Exman did not have an enforceable right to any payment from the Debtor because: (a) the Bill of Sale from Jorgensen merely transferred the Debtor's stock, not any subrogation rights Jorgensen may have possessed; and (b) as Exman had asserted in support of

---

**15.** The Trustee's Report of No Assets, which was filed on February 7, 1997, was followed by the finalization of the Chapter 11 case fee applications and related orders, with the last Orders granting payment of professional fees being entered on June 2, 1997 and October 3, 1997, while the final decree closing the case was not entered until November 20, 1998.

**16.** This assertion was in response to the Trustee's allegations that he was never advised that Morell had passed away.

**17.** The Bill of Sale, notarized on December 1, 2006, signed by Jorgensen, provides that upon receipt of $1.00 from Exman, Jorgensen, as seller "... does hereby bargain, sell, assign, and deliver unto Jan Exman ('Purchaser'), all

of her right, title and interest ... in and to all issued and outstanding stock of Seller in J & S Conveyors, Inc."

**18.** Section 521(a)(1)(B)(I) provides that:

(a) The debtor shall—
  (1) file—
  (B) unless the court orders otherwise—
  (I) a schedule of assets and liabilities;
11   U.S.C. § 521 (2009).

**19.** Section 350(b) provides that:

(b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.
11   U.S.C. § 350 (2009).

the Trustee's Chapter 7 Claim Objections, any claim he might have was also now barred by the applicable state law statute of limitations.

The Court orally denied Exman's Turnover Motion[20] on the grounds that: (1) Section 521(a)(1)(B)(I) specifically required a debtor to file a schedule of assets; (2) the Debtor's duty to comply with this section included a duty to properly complete and execute "Schedule B—Personal Property," which includes at item Number 9, "Interests in Insurance Policies. Name insurance company of each policy and itemize surrender or refund value of each.";[21] (3) the Debtor's inclusion of the Insurance Policies on Schedule G, which is specifically designed to disclose any interests in executory contracts and leases, rather than on Schedule B, with its explicit language regarding the disclosure of insurance policies, failed to comply with the requirements of Section 521(1); and (4) any knowledge by a trustee of an asset, such as the Insurance Policies, does not cure improper scheduling unless he actively administers those assets, especially since creditors and parties in interest may not have all of the knowledge that a trustee gains during the administration of a case. Accordingly, the Court determined that the Insurance Policies were not abandoned pursuant to Section 554(c). Furthermore, the Court reasoned that since the Insurance Policies were not deemed abandoned, they remained property of the estate, and the reopening of the case in order to administer those assets or their proceeds was a proper exercise of the Court's discretion under Section 350(b).

The Court also orally ruled[22] that Exman did not have any rights as a subrogated secured creditor by reason of the Bill of Sale, which by its express terms only transferred to him any stock in the Debtor that Jorgensen had, not any subrogation rights that she might have had as a guarantor of the Debtor's obligations to NBG or as the beneficiary of any similar rights that Morell or his estate may have had.

The Court adjourned the Trustee's Objection to the Reopened Chapter 7 Claims for continued hearings on: (1) any additional proof by Exman of any valid and enforceable subrogation rights he might have in and to the proceeds of the Insurance Policies; and (2) the determination that, if any such subrogation rights were derived through Morell and Jorgensen, or either of them, as guarantors of the NBG debt, whether they could be the basis for an allowed claim if NBG was found to have an informal proof of claim in the Chapter 11 case, since it was undisputed that it had not filed a formal proof of claim.[23]

On December 16, 2008, in response to the Court's oral ruling disallowing the Reopened Chapter 7 Claims, the UST filed a Motion for Reconsideration Regarding Conclusion of Law that Creditors Must File a Proof of Claim In a No Asset Case, Despite Clerk's Instructions to Not File a Proof of Claim so as to Preserve Their

20. The Court and the parties agreed that the ruling was interlocutory and would be included with substantially greater detail in a later written Decision & Order to be filed in the case.

21. Although the Court was not provided with Debtor's Schedule B, Schedule B is a standard form, and the parties arguments made it clear that the Insurance Policies were not listed on Schedule B.

22. The Court and the parties agreed that the ruling was interlocutory and would be included with substantially greater detail in a later written Decision & Order to be filed in the case.

23. The Court's oral ruling upholding the Trustee's Chapter 7 Claim Objections meant that even if Exman could prove his alleged subrogation rights, his Reopened Chapter 7 Claim No. 7 could not be allowed.

Claim Listed on Schedule F (the "Motion to Reconsider"). In the Motion to Reconsider, a supplement to the Motion, and at oral argument, the UST asserted that the Chapter 7 claimants should share in the distribution of the proceeds of the Insurance Policies because: (1) a claim under Section 101(5)(a) is controlled by Section 502(b), which provides that if an objection to a claim is made, "the court ... shall determine the amount of such claim ... as of the date of the filing of the petition ...," thus an underlying claim reverts back to the petition date; (2) a notice to creditors sent by the Clerk of the Court pursuant to Rule 2002(e) operates as a permanent toll on the statutory claims bar date for creditors to file their claims such that when new assets are discovered, creditors may timely file a proof of claim pursuant to an asset notice, where recovery on the claim might otherwise be barred by any applicable state law statute of limitations; (3) it would give effect to Rule 3002(c)(5),[24] which provides creditors who, because of a Rule 2002(e) notice, may not have previously filed a claim, with notice and an opportunity to file a claim if new assets are discovered; (4) it would comport with the Code's intent not to require creditors to file a proof of claim, evidenced by the fact that chapter 7 unsecured claims listed on Schedule F, which are not disputed, contingent or unliquidated, are treated as valid at filing, with no requirement that judgment be sought outside of bankruptcy to enforce their claim; (5) creditors should be able to rely upon a notice from the Clerk of the Court pursuant to Rule 2002(e); (6) the Clerk's office would be burdened with additional claims if it could not benefit from Rule 2002(e); and (7) unscrupulous debtors who failed to schedule assets would be rewarded when the assets are found, but cannot be distributed because creditor's claims are barred by the statute of limitations.

On April 15, 2009, the Court reserved decision on the Motion to Reconsider.

Upon further submissions by the Trustee and Exman concerning Exman's purported status as a creditor, including his alleged subrogation rights, it was agreed by Exman and the Trustee that the critical issue for the Court to decide at that point in the Reopened Chapter 7 Case was whether the NBG Cash Collateral Stipulation constituted an informal proof of claim that Exman could utilize to support his subrogation claim.

The Trustee and Exman agreed that the elements of a four-prong test must be met in order to establish an allowable informal proof of claim, including the requirement that the document or documents upon which it was asserted constituted an informal proof of claim must evidence the creditor's intent to hold a debtor personally liable for the debt in question, the only disputed prong of the four-prong test.

In his Statement in Support of Exman's Subrogation, filed on February 4, 2009 and Supplement thereto, filed on February 23, 2009, Exman argued that the Cash Collateral Stipulation, executed on October 26, 1995 by Debtor and NBG, and as a corol-

---

**24.** Bankruptcy Rule 3002(c)(5) provides that:

(c) Time for Filing. In a chapter 7 liquidation, chapter 12 family farmer's debt adjustment, or chapter 13 individual's debt adjustment case, a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under § 341(a) of the Code, except as follows:

(5) If notice of insufficient assets to pay a dividend was given to creditors pursuant to Rule 2002(e), and subsequently the trustee notifies the court that payment of a dividend appears possible, the clerk shall give at least 90 days' notice by mail to creditors of that fact and of the date by which proofs of claim must be filed.

FRBP Rule 3002 (2009).

lary, the extension of the Cash Collateral Stipulation, executed on July 1, 1996, demonstrated NBG's intent to hold the Debtor liable for its debt. Specifically, Exman asserted that the Cash Collateral Stipulation: (1) stated the exact amount the Debtor owed to NBG based upon the listed notes and loan agreements, which each included a statement of the principal amount owed and the accruing interest;[25] (2) demonstrated NBG's intent to maintain a right to be repaid from the Debtor by providing for principal and interest payments to be made from the Debtor's cash collateral account maintained with NBG on certain identified loans;[26] and (3) even if the Life Insurance Policies were not specifically identified in the Cash Collateral Stipulation, as a matter of law it constitutes an informal proof of an unsecured claim to the extent that the collateral identified was inadequate to satisfy NBG's debt in full.

On February 18, 2009, the Trustee filed a Supplement to Trustee's Objection to Exman's Claim as Subrogated Creditor, which included further arguments concerning Exman's alleged subrogation rights. Also, the Trustee asserted that the Cash Collateral Stipulation: (1) did not express NBG's intent to hold the Debtor personally liable for its debt, but rather sought to preserve its rights to repayment from its

collateral; and (2) specifically required that the identified collateral maintain a value in excess of NBG's secured claim, thus indicating that NBG sought full recovery from the collateral itself, not from the Debtor.

On April 1, 2009, the Court reserved decision but orally ruled that, based upon the Cash Collateral Stipulation, which was the only document purported by Exman to constitute an informal proof of claim, the Cash Collateral Stipulation did not constitute an informal proof of claim because it did not evidence NBG's intent to hold the Debtor personally liable. The Court reasoned, among other things, that: (1) NBG was oversecured and the Cash Collateral Stipulation was conditioned upon the Debtor maintaining collateral of a value in excess of NBG's debt; (2) NBG contemplated being paid on its debt, and it was in fact paid from Debtor's collateral by withdrawals from a cash collateral account maintained by the Debtor; and (3) there was no language in the Cash Collateral Stipulation that, in the Court's opinion, evidenced NBG's intent to specifically hold the estate liable should its adequate protection fail.

### DISCUSSION

With the knowledge and understanding that the following rulings may still be in-

25. The Cash Collateral Stipulation, Paragraph 2 states: "The Debtor is indebted to NBG in the amount of $881,314.78, plus per diem interest of $268,131.45 from October 26, 1995, together with costs and expenses (including legal and appraisal fees)...."

26. The Cash Collateral Stipulation, Paragraph 10 states: "Repayment of Indebtedness. Debtor shall make monthly payments of accrued interest on the indebtedness. Debtor authorizes NBG to deduct interest payments from the Cash Collateral Account on the first business day of each month. Principal payments shall be made from the Cash Collateral Account as follows: (a) principal shall be paid monthly on the Debt Instruments referred to in Paragraphs 2(b) and 2(c) above, in accordance with their terms; (b) subject to the automatic stay of Section 362 of the Bankruptcy Code, the entire principal balance on the Debt Instruments referred to in paragraphs 2(a) and 2(d) above shall be due and payable in accordance with the terms of the Debt Instruments. No funds from the Cash Collateral Account shall be applied to the principal on the Debt Instruments referred to in Paragraphs 2(a) and 2(d) during the pendency of the automatic stay, and (c) the entire principal balance of the Debt Instrument referred to in Paragraph 2(e) shall be due and payable on February 29, 1996. Debtor authorizes NBG to deduct principal payments from the Cash Collateral Account."

terlocutory, it is nevertheless important for both the Court and the interested parties to establish the current law of the case, so that additional issues can be briefed, argued and then decided or settled. At that point, a final determination can be made by the Court as to how the proceeds of the Insurance Policies are to be distributed.

## A. Were the Insurance Policies or their proceeds abandoned pursuant to Section 554(c)?

■ The Court reaffirms its oral ruling that the Insurance Policies and their proceeds were not abandoned pursuant to Section 554(c) when the Chapter 7 case was initially closed, and accordingly they did not remain Section 541 property of the estate, for the following reasons:

1. The Official Forms for Schedule B specifically provide for the scheduling of insurance policies. Thus, to be properly scheduled for purposes of Section 554(c), interests in insurance policies must be listed on Schedule B. This is where trustees, creditors, and other parties in interest would expect to find information as to whether a debtor has any interests in insurance policies;

2. Although a debtor may view an insurance policy itself as an executory contract, and believe it prudent to also disclose the insurance policy on the Schedule G statement of Executory Contracts, disclosing it on that Schedule can never serve as a substitute for the explicit requirement of Section 521(a)(1)(B)(I) that the Debtor file a schedule of assets, since an interest in an insurance policy such as the Debtor's Keyman insurance policies is clearly an asset;

3. Although the Trustee may have been aware of the Insurance Policies from his reading of the Debtor's Schedule G Statement of Executory Contracts that knowledge does not constitute the administration of those assets for purposes of Section 554(c), and does not impart that knowledge to creditors and other interested parties.

## B. Are the Reopened Chapter 7 Claims allowable under Section 502(b)(1), even though the Claims may no longer be enforceable against the Debtor under applicable State law?

[2, 3] As set forth in the Background to this Decision & Order, the Court had previously orally ruled that the Reopened Chapter 7 Claims could not be allowed under Section 502(b)(1), primarily because: (1) the Court is firmly of the opinion that for any proof of claim seeking a right to payment based upon state law to be allowed in a bankruptcy case, pursuant to Section 502(b)(1), the claimant's right to payment must be enforceable against the debtor under applicable state law when the claim is filed; (2) even though a claim may otherwise be unenforceable under applicable state law, the requirements of Section 502(b)(1) are met if the claimant was stayed or the applicable state law statute of limitations was tolled by a relevant statute, a recognizable equitable doctrine or a Court order, once the Debtor's Chapter 7 case was closed; (3) the Court was unaware of any such statute, equitable doctrine or order that prevented the running of the applicable state law statute of limitations on the Reopened Chapter 7 Claims; and (4) the Chapter 7 Notice to Creditors did not constitute such a qualifying statute, equitable doctrine or order.

■ Although the Court still agrees with the legal analysis of the Trustee and Exman, it is persuaded by the Motion to Reconsider that creditors must be able to rely on Clerk's Office notices

given in a bankruptcy case, such as the Chapter 7 Notice to Creditors, even though: (1) the often mistaken belief that the Court and the Clerk's Office are one and the same is not true; (2) the drafters of Rule 2002(e) may never have envisioned an unusual set of facts and circumstances such as the ones before this Court, where the result of the Rule might be to allow creditors to file and have claims allowed at a time when they have absolutely no enforceable right to payment against a debtor, contrary to the requirement of Section 502(b)(1); (3) Rule 2002(e), although optional, when it is utilized by a Clerk's Office, it arguably results in a judicial estoppel; and (4) the implementation of Rule 2002(e) can, as in this case, result in creditors who file claims at a time when they do have an enforceable right to payment from a debtor, having their distributions reduced by claims filed by creditors who do not have any enforceable right to payment against a debtor at the time their claims are filed but must be allowed.[27]

## C. Did the NBG Cash Collateral Stipulation Constitute an Informal Proof of Claim?

■ The Court reaffirms its oral ruling that the Cash Collateral Stipulation did not qualify as an informal proof of claim because it failed to evidence the intent of NBG to hold the Debtor liable for the debt as required by the fourth prong of the four-prong test set forth in *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 99 (Bankr.S.D.N.Y.2007) (citing *Houbigant, Inc. v. ACB Mercantile, Inc.*, 190 B.R. 185, 187 (Bankr. S.D.N.Y.1995)) for the following reasons: (1) there is no explicit language in the Cash Collateral Stipulation that indicates an intent to hold the estate liable for the debt due to NBG, similar to the language often included in such stipulations, which provides for an administrative expense if adequate protection fails from the Debtor's use of cash collateral, or language setting forth the right to claim for any deficiency if the collateral is insufficient to pay the debt if and when the right to use cash collateral terminates and the stay is lifted pursuant to the agreement; (2) the NBG indebtedness set forth in the Cash Collateral Stipulation as approximately one million dollars is less than the collateral value also listed; (3) the cash collateral value of the Debtor's inventory alone at cost was significantly greater than the amounts owed to NBG; (4) payments of adequate protection were not to be made by the Debtor by payments to NBG, but were to be deducted from a lock-box account; and (5) the use of collateral was conditioned upon the Debtor maintaining an accounts receivable level which itself far exceeded the amount due to NBG.

27. It is important to note in connection with this ruling, that Morell and Jorgensen were listed at 1747 West Bloomfield Road, Honeoye Falls, New York on the matrix included with the affidavit of service for the Asset Notice, so it is reasonable to assume that they also received the Chapter 7 Notice to Creditors. As a result, it may be that if Exman can demonstrate that he is a creditor because he holds any valid and enforceable subrogation rights that Morell and Jorgensen may have had as guarantors, who subsequently paid a portion of the debt due from the Debtor to NBG, that his Claim No. 7 may ultimately be allowed pursuant to Section 502 along with the other Reopened Chapter 7 Claims. Arguably Morell and Jorgensen may not have filed a protective claim as guarantors in the converted Chapter 7 Case, pursuant to Section 502(e), because of the direction not to file claims contained in the Chapter 7 Notice to Creditors.

**D.** *Is Exman a Creditor of the Debtor by reason of a valid transfer to him of any valid subrogation rights that Morell and/or Jorgensen may have had with respect to the indebtedness of the Debtor to NBG, by reason of the fact that they were guarantors of the indebtedness and one or both of them paid certain proceeds to NBG from the sale of their residence subsequent to the conversion of the Debtor's Chapter 11 case to a Chapter 7 case?*

The Court reaffirms its prior oral ruling that the Bill of Sale did not transfer to Exman any rights of subrogation that Jorgensen may have had at the time of the execution of the Bill of Sale.

The determination of Exman's subrogation rights must now be determined by the Court, notwithstanding its ruling that the Cash Collateral Stipulation does not constitute an informal proof of claim, because of its decision on the Motion to Reconsider that the Reopened Chapter 7 Claims, including Exman's Claim No. 7, can be determined to be allowed claims pursuant to Section 502. In that regard, Exman must demonstrate that: (1) Morell and/or Jorgensen acquired subrogation rights in a portion of the debt due from the Debtor to NBG by reason of a payment, as guarantors; (2) one or both of them in fact made such a payment as a guarantor, and the amount of the payment can be determined; and (3) he has obtained a valid and enforceable transfer of the subrogation rights held by Morell and/or Jorgensen.

Should Exman demonstrate those elements, the Court must also determine whether those subrogation rights entitle Exman to a secured or an unsecured claim with respect to the proceeds of the Insurance Policies.

## CONCLUSION

In order to afford the parties the opportunity to consider the above rulings and the possibility of settling these matters, and in the event the matters do not settle, this case shall be called on the Court's Motion Calendar on September 16, 2009 at 11:00 a.m. At that time, it will be determined how any remaining issues, including Exman's Claim No. 7, will be presented to and determined by the Court.

**IT IS SO ORDERED.**